## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
## PORTLAND DIVISION

OREGON TRADESWOMEN, INC.,
454 SE 187th Ave.
Portland, OR 97233,

PRIDE AT WORK,
815 16th St., NW
Washington, D.C. 20006,

AMERICAN FEDERATION OF
TEACHERS, INC.,
555 New Jersey Ave., NW
Washington, D.C. 20001,

       *Plaintiffs*,

    v.

U.S. DEPARTMENT OF LABOR;  OFFICE
OF FEDERAL CONTRACT COMPLIANCE
PROGRAMS; AL STEWART, in his official
capacity as Acting Secretary of the U.S.
Department of Labor; and JENNY YANG, in
her official capacity as Director of the Office
of Federal Contract Compliance Programs,
200 Constitution Ave., NW
Washington, D.C. 20210

       *Defendants.*

Case No. 3:21-cv-00089

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# TABLE OF CONTENTS

Introduction ................................................................................................................ 1

Jurisdiction and Venue .............................................................................................. 4

Parties ........................................................................................................................ 4

Factual Allegations .................................................................................................... 5

    I.      Employment Discrimination Harms Women and LGBTQ Workers ................... 5

    II.     The Policy of Nondiscrimination in Federal Contracting ................................. 10

    III.    The Religious Exemption ................................................................................. 13

         A.    The history of the Religious Exemption in Federal Contracting ............. 13

         B.    The Trump Adminstration's Expansions of the Religious Exemption ..... 16

             1.    Expanding who can claim the religious exemption ..................... 18

             2.    Expanding the scope of the religious exemption ......................... 20

             3.    The Department's flawed justification for the rule ...................... 23

             4.    Impacts of the rule on women and LGBTQ community
                  individuals ................................................................................... 25

    VI.    The Religious Exemption Impedes Plaintiffs' Missions and Will Cause a
         Diversion of Resources ................................................................................... 27

         A.    Plaintiffs' missions are to promote equity and diversity in the
            workplace .............................................................................................. 27

             1.    Oregon Tradeswomen .................................................................. 27

             2.    Pride at Work ............................................................................... 29

             3.    AFT .............................................................................................. 31

         B.    The Religious Exemption Rule injures Plaintiffs ................................... 32

Claims for Relief ...................................................................................................... 34

Request for Relief ..................................................................................................... 35

## INTRODUCTION

Plaintiffs Oregon Tradeswomen, Inc. ("Oregon Tradeswomen"), Pride at Work, and the American Federation of Teachers ("AFT") (collectively "Plaintiffs") bring this action under the Administrative Procedure Act ("APA") and allege as follows:

1.      For nearly eighty years, it has been the stated policy of the United States to prohibit, prevent, and address employment discrimination by companies and organizations that receive federal contracts and subcontracts.

2.      That policy is enshrined in Executive Order 11,246, which, among other things, prohibits federal contractors and subcontractors from discriminating on the basis of race, color, religion, sex, sexual orientation, gender identity, or national origin.

3.      However, the Trump Administration moved further and further from this policy, including through its waning days.

4.      In December 2020, the Office of Federal Contract Compliance Programs ("OFCCP" or the "Department"), acting under the direction of then-Director Craig Leen and then-Secretary of Labor Eugene Scalia, issued a final rule that clears the way for federal contractors and subcontractors to make discriminatory employment decisions that harm women and the LGBTQ community, among others, by claiming religious objections. *See* Implementing Legal Requirements Regarding the Equal Opportunity Clause's Religious Exemption, 85 Fed. Reg. 79,324 (Dec. 9, 2020) (hereinafter the "Religious Exemption Rule").

5.      The Trump Administration's Religious Exemption Rule reinterprets what had previously been an appropriately cabined exemption to the nondiscrimination requirements of Executive Order 11,246—an exemption that had allowed religious organizations to give preference to coreligionist applicants when making hiring decisions and do so without violating

Executive Order 11,246's mandate prohibiting contractors from discriminating on the basis of religion.

6.      The Religious Exemption Rule vastly expands the reach of that limited exemption and expressly authorizes federal contractors and subcontractors to make employment decisions that discriminate on the basis of sex, sexual orientation, or gender identity, among others, by simply citing to the employer's religious beliefs or views.

7.      The rule does so in multiple ways. ***First***, the rule adopts a highly deferential test for determining whether a federal contractor or subcontractor is a religious organization that can claim the exemption—including by now allowing for-profit companies to qualify. ***Second***, the rule adopted broad definitions of "religion" and "particular religion" to make clear that the exemption is no longer limited to "denominational preferences," *i.e.*, preferences for coreligionists, or people who are of the same religion. 85 Fed. Reg. at 79,330, 344, 371. ***Third***, the rule allows religious organizations to make employment decisions that would otherwise involve unlawful discrimination on the basis of sex, sexual orientation, or gender identity, by simply citing to religious objections. *Id.* at 79,354. ***Fourth***, the rule allows religious organizations to claim the religious exemption for all employment decisions (instead of only during the hiring process), regardless of whether those decisions further the organization's religious purpose. *Id.* at 79,346-47. And ***fifth***, the rule adopts a highly deferential mode of inquiry, under which the Department will "merely ask[] whether a sincerely held religious belief actually motivated the institution's actions." *Id.* at 79,341.

8.      As a result of these regulatory changes, the Religious Exemption Rule will now allow a federal contractor or subcontractor to, for example, make employment decisions based on an organization's beliefs "regarding matters such as marriage and intimacy," so long as they

are sincere and tied to religious tenets. *Id.* at 79,364. The rule also diverges from settled interpretations of the religious exemption as provided for in Title VII of the Civil Rights Act, 42 U.SC. § 2000e-1(a)—on which the religious exemption at issue here is mirrored, using virtually identical text.

9.      To justify this broad expansion of the law, the Department takes the extraordinary position, in contradiction of Supreme Court precedent, that it has "less than a compelling interest in enforcing [Executive Order] 11,246 when a religious organization takes employment action solely on the basis of sincerely held religious tenets that also implicate a protected classification, other than race." *Id.* at 79,354. *But see Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 626 (1984).

10.     The Department thus enacted this regulatory expansion without any consideration of the harms that this rule will cause by limiting civil rights protections for women and LGBTQ workers—defying the Supreme Court's admonishment that the government must consider the effects on third parties when crafting religious accommodations, *See Cutter v. Wilkinson*, 544 U.S. 709, 720, 722 (2005), and without any acknowledgment,  yet alone reasoned explanation, of its decision to reverse its position on how to weigh the potential harms to protected classes with the need to accommodate religious objections, *see FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).

11.     For these and many other reasons discussed below, the Religious Exemption Rule is unlawful. The Department's rule contravenes the plain text of Executive Order 11,246. It is unreasoned, unjustified, and unsupported by the record. And it reverses the Department's prior interpretation of the religious exemption without a reasoned explanation.

12.     Accordingly, this Court must declare the Rule unlawful and set it aside.

**JURISDICTION AND VENUE**

13.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. §§ 702 *et seq.*

14.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) because Plaintiff Oregon Tradeswomen is incorporated and headquartered in Portland, Oregon.

**PARTIES**

15.    Plaintiff Oregon Tradeswomen is a not-for-profit organization, incorporated and headquartered in Portland, Oregon.

16.    Plaintiff Pride at Work is a not-for-profit organization, incorporated and headquartered in Washington, D.C.

17.    Plaintiff AFT is national labor union representing approximately 1.7 million members across the United States, including healthcare professionals, educators, and public service workers. AFT has over 3,000 affiliated local unions and 44 state federations throughout the United States. AFT is headquartered in Washington, D.C.

18.    Defendant U.S. Department of Labor is an executive agency of the United States within the meaning of the APA.

19.    Defendant OFCCP is an executive agency of the United States within the meaning of the APA.

20.    Defendant Al Stewart is the Acting Secretary of the Department of Labor. He is sued in his official capacity.

21.    Defendant Jenny Yang is the Director of OFCCP. She is sued in her official capacity.

## FACTUAL ALLEGATIONS

I.    <u>**Employment Discrimination Harms Women and LGBTQ Workers.**</u>

22.    Employment discrimination remains prevalent in today's workforce. Women and LGBTQ individuals, including women of color and LGBTQ-individuals of color (and those who belong to more than one of these groups), continue to face discrimination in the workplace, including through workplace harassment, pay discrimination, bias that imposes obstacles to being hired or promoted, and a greater likelihood of being fired.

23.    In fact, as of 2014, more than four in ten lesbian, gay, and bisexual people have experienced some form of employment discrimination based on their sexual orientation.[1] For transgender workers, the number is even starker: nine in ten.[2]

24.    A recent survey found that LGB people are significantly more likely to report experiences of employment discrimination as opposed to their heterosexual peers, with 60% reporting being fired from or denied a job and 48% being denied a promotion or receiving a negative evaluation, compared to 40% and 32% respectively among heterosexuals.[3]

25.    Additionally, according to a 2017 survey, "one in five LGBTQ people report[ed] being personally discriminated against because of their sexuality or gender identity when applying for jobs," and 22% said they had experienced such discrimination in pay or promotion.[4]

---

[1] Off. of the Press Sec'y, The White House, *FACT SHEET: Taking Action to Support LGBT Workplace Equality is Good for Business* (July 21, 2014), https://obamawhitehouse.archives.gov/the-press-office/2014/07/21/fact-sheet-taking-action-support-lgbt-workplace-equality-good-business-0 (hereinafter "White House Fact Sheet").
[2] *Id.*

[3] Ilan H. Meyer, *Experiences of Discrimination among Lesbian, Gay and Bisexual People in the US* 1 (Apr. 2019), https://williamsinstitute.law.ucla.edu/wp-content/uploads/LGB-Experience-Discrim-Apr-2019.pdf.

[4] NPR et al., *Discrimination in America: Experiences and Views of LGBTQ Americans* 29 (Nov. 2017), https://legacy.npr.org/documents/2017/nov/npr-discrimination-lgbtq-final.pdf.

26.    Indeed, a 2016 nationally representative survey found "25.2 percent of LGBT respondents ha[d] experienced discrimination because of their sexual orientation or gender identity *in the past year.*"[5]

27.    In addition, many studies show a significant pay gap for gay and bisexual men when compared to heterosexual men who have the same productive characteristics. For example, a 2015 meta-analysis examining more than thirty separate studies found that gay and bisexual men, on average, earn 11% less than comparable heterosexual men.[6]

28.    Employers often cite to religious objections when attempting to justify discrimination.

29.    According to a 2013 survey by Pew Research Center,

The religious basis for opposition to homosexuality is seen clearly in the reasons people give for saying it should be discouraged by society. By far the most frequently cited factors—mentioned by roughly half (52%) of those who say homosexuality should be discouraged—are moral objections to homosexuality, that it conflicts with religious beliefs, or that it goes against the Bible. No more than about one-in-ten cite any other reasons as to why homosexuality should be discouraged by society.[7]

30.    Additionally, in the largest survey to date of transgender people (with more than 27,700 respondents), 19% of respondents who had been part of a faith community were rejected

---

[5] Sejal Singh & Laura E. Durso, Ctr. for Am. Progress, *Widespread Discrimination Continues to Shape LGBT People's Lives in Both Subtle and Significant Ways* (May 2, 2017), https://www.americanprogress.org/issues/lgbtq-rights/news/2017/05/02/429529/widespread-discrimination-continues-shape-lgbt-peoples-lives-subtle-significant-ways/ (emphasis added).

[6] M.V. Lee Badgett, et al., Comment Letter on Implementing Legal Requirements Regarding the Equal Opportunity Clause's Religious Exemption, at 20 (Sept. 16, 2019), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Comment-OFCCP-Sep-2019.pdf (citing Marieka M. Klawitter, *Meta-Analysis of the Effects of Sexual Orientation on Earnings*, 54 Indus. Rel. 4, 21-25 (2015)).

[7] Pew Res. Ctr., *In Gay Marriage Debate, Both Supporters and Opponents See Legal Recognition as "Inevitable"* (June 6, 2013), https://www.pewresearch.org/politics/2013/06/06/in-gay-marriage-debate-both-supporters-and-opponents-see-legal-recognition-as-inevitable/.

from it, and 39% of respondents who had been part of a faith community left due to fear of rejection because they were transgender.[8]

31.    By expanding the scope of *who* can claim the exemption and for *what reasons*, the Religious Exemption Rule will now make it more likely that LGBTQ individuals will experience workplace discrimination.

32.    In addition to LGBTQ women, employment discrimination likewise remains a serious problem for all women in the workplace.

33.    According to a 2017 survey by Pew Research Center, about four-in-ten working women (42%) in the United States report having faced workplace discrimination because of their gender.[9]

34.    Moreover, women working full-time, year-round, typically are paid about 82 cents for every dollar that men are paid.[10] For women of color, the pay gap is wider, with Black women working full-time, year-round making about 63 cents, Native American women 60 cents, and Latina women 55 cents, for every dollar paid to white, non-Hispanic men.[11] Studies show that even controlling for race, region, unionization status, education, experience, occupation, and

---

[8] Sandy E. James, et al., Nat'l Ctr. for Transgender Equality, *The Report of the 2015 U.S. Transgender Survey* 77 (2016), https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf.

[9] Kim Parker & Cary Funk, Pew Res. Ctr., *Gender Discrimination Comes in Many Forms for Today's Working Women* (Dec. 14, 2017), https://www.pewresearch.org/fact-tank/2017/12/14/gender-discrimination-comes-in-many-forms-for-todays-working-women/.

[10] Nat'l Women's Law Ctr., *The Wage Gap: The Who, How, Why, and What to Do* 1 (Oct. 2020), https://nwlc.org/resources/the-wage-gap-the-who-how-why-and-what-to-do/; U.S. Census Bureau, *Income, Poverty & Health Insurance Coverage in the United States: 2017* (Sep. 12, 2018), https://www.census.gov/newsroom/press-releases/2018/income-poverty.html.

[11]  Nat'l Women's Law Ctr., *The Wage Gap*, at 1.

industry leaves 38% of the pay gap unexplained.[12] One study found that the average earnings of transgender women workers fall by nearly one-third after transitioning.[13]

35.    As with sexual orientation and gender identity discrimination, discrimination against women in employment frequently occurs in the context of employers' religious objections. Indeed, as the Supreme Court recognized in *Frontiero v. Richardson*, this country has a long history of sex discrimination that is rationalized, in part, by citing to religious beliefs. 411 U.S. 677, 684 (1973) (noting that sex discrimination had been rationalized by a belief that "[t]he constitution of the family organization, *which is founded in the divine ordinance*, as well as in the nature of things, indicates the domestic sphere as that which properly belongs to the domain and functions of womanhood" (quoting *Bradwell v. Illinois*, 16 Wall. 130, 141 (1873) (Bradley, J., concurring)) (emphasis added)).[14]

36.    Women have been fired or demoted—or threatened with such penalties—for their decisions to access reproductive health care, such as contraception,[15] abortion,[16] and in-vitro

---

[12] *Id.* at 3.

[13] *Id.* at 2 (citing Kristen Schilt & Matthew Wiswall, *Before and After: Gender Transitions, Human Capital, and Workplace Experiences*, 8 B.E. J. of Econ. Analysis & Pol'y 39 (Sept. 2008)).

[14] *See also, e.g.*, Jennifer S. Hendricks & Dawn Marie Howerton, *Teaching Values, Teaching Stereotypes: Sex Education and Indoctrination in Public Schools*, 13 U. Pa. J. Const. L. 587, 607 (2011), https://scholar.law.colorado.edu/cgi/viewcontent.cgi?article=1165&context=articles (sex stereotypes and traditional gender roles in public school education curricula are "likely due in large part to the religious beliefs that motivate many of the curricula").

[15] Doug Erickson, *Wisconsin Diocese Offers Birth Control Insurance, But Warns Employees Not to Use It*, The Courier (Aug. 10, 2010), https://wcfcourier.com/news/local/wisconsin-diocese-offers-birth-control-insurance-but-warns-employees-not/article_0b904262-a4e4-11df-bde9-001cc4c002e0.html (after Wisconsin passed its law requiring employers to offer employees insurance plans that include birth control coverage, the Madison Catholic Diocese told employees that they could be fired if they actually used the benefit to access contraception).

[16] *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 364 (3d Cir. 2008), *order clarified*, 543 F.3d 178 (3d Cir. 2008) (woman fired for having an abortion); *Ducharme v. Crescent City Déjà Vu,*

fertilization,[17] and for their decisions about whether and how to start a family, including becoming pregnant outside of marriage or becoming pregnant while in an LGBTQ relationship.[18]

37.    Women also experience pay discrimination and barriers to advancement because of their employers' beliefs—often religiously motivated—about the appropriate role of women in society, including that a woman's primary role is as a mother.[19]

38.    Even the decision to work can trigger discrimination that is tied to religious beliefs. For example, a man might refuse to work with, or train, a woman, claiming that being alone with a woman who is not his wife is against his religious values.[20]

39.    These types of discrimination against women are now at risk of being legally permissible under the Religious Exemption Rule.

---

*L.L.C.*, 406 F. Supp. 3d 548 (E.D. La. 2019) (woman fired at her job for having an abortion—which the employer said violated its religious beliefs).

[17] *See, e.g.*, *Hall v. Nalco Co.*, 534 F.3d 644, 648-49 (7th Cir. 2008) (woman was fired for taking time off to undergo in-vitro fertilization); *Herx v. Diocese of Ft. Wayne-South Bend Inc.*, 48 F. Supp. 3d 1168 (N.D. Ind. 2014) (a teacher's contract was not renewed for her decision to undergo in-vitro fertilization—which the employer said violated its religious beliefs); *Ciocca v. Heidrick & Struggles, Inc.*, No. CV 17-5222, 2018 WL 2298498, at *3-4 (E.D. Pa. May 21, 2018) (woman was discriminated against for her decision to undergo in-vitro fertilization).

[18] *Ganzy v. Allen Christian Sch.*, 995 F. Supp. 340, 345 (E.D.N.Y. 1998) (an unmarried teacher at a religious school was fired because, as the school explained, her pregnancy was "clear evidence that she had engaged in coitus while unmarried"); *see also* Dana Liebelson & Molly Redden, *A Montana School Just Fired a Teacher for Getting Pregnant. That Actually Happens All the Time.*, Mother Jones (Feb. 10, 2014), https://www.motherjones.com/politics/2014/02/catholic-religious-schools-fired-lady-teachers-being-pregnant/.

[19] *Ohio Civ. Rts. Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 623 (1986) (employer denied women insurance because of "a religious doctrine that mothers should stay home with their preschool age children"); *Chadwick v. WellPoint, Inc.*, 561 F.3d 38, 47-48 (1st Cir. 2009) (woman with four children denied promotion because her supervisors assumed she had "a lot on [her] plate"); *Lust v. Sealy, Inc.*, 383 F.3d 580, 583 (7th Cir. 2004) (woman had not been promoted "because she had children" and because the employer "didn't think she'd want to relocate her family, though she hadn't told him that").

[20] *See* Complaint, ECF No. 1, *Torres v. Carter*, No. 5:19-cv-00327-FL (E.D.N.C. July 31, 2019).

## II.    The Policy of Nondiscrimination in Federal Contracting.

40.    Given the seriousness of the problem of discrimination in the workplace, and to prevent taxpayer dollars from funding such discrimination, the federal government has long sought to prohibit, prevent, and address employment discrimination by federal contractors and subcontractors.

41.    Additionally, research has long confirmed that workplace discrimination and a lack of diversity lead to inefficiencies.[21] Preventing discrimination in the federal procurement process is thus necessary to carry out Congress's mandate to the President and, by extension, the Department, to "prescribe policies and directives" necessary to "provide the Federal Government with an economical and efficient system for" procuring contracts, and to enable procurement in a manner "advantageous to [the Federal Government] in terms of economy, efficiency, or service." Federal Property & Administrative Services Act ("the Procurement Act"), 40 U.S.C. §§ 101(a), 121(a), 501(a).

42.    Accordingly, beginning in 1941, a series of executive orders[22] have promoted economy and efficiency in federal contracting by prohibiting and preventing discrimination by federal contractors—culminating in Executive Order 11,246, 30 Fed. Reg. 12,319 (Sept. 24, 1964), which, as amended, remains in effect today and prohibits discrimination by federal

---

[21] *See, e.g.*, Vivian Hunt, et al., McKinsey & Co., *Why Diversity Matters* (Jan. 1, 2015), https://www.mckinsey.com/business-functions/organization/our-insights/why-diversity-matters#; Carra S. Sims, et al., *The Effects of Sexual Harassment on Turnover in the Military: Time-Dependent Modeling*, 90 J. Applied Psychol. 1141 (Dec. 2005), https://www.researchgate.net/publication/7453306_The_Effects_of_Sexual_Harassment_on_Turnover_in_the_Military_Time-Dependent_Modeling; Gary S. Becker, *The Economics of Discrimination* (2d ed. 1971).

[22] *See* Exec. Order No. 8,802, 6 Fed. Reg. 3,109 (June 25, 1941); Exec. Order No. 9,346, 8 Fed. Reg. 7,183 (May 27, 1943); Exec. Order No. 10,308, 16 Fed. Reg. 12,303 (Dec. 3, 1951); Exec. Order No. 10,479, 18 Fed. Reg. 4,899 (Aug. 13, 1953); Exec. Order No. 10,557, 19 Fed. Reg. 5,655 (Sept. 3, 1954).

contractors and subcontractors on the bases of race, color, religion, sex, sexual orientation, gender identity, and national origin.[23]

43.     As an Attorney General Opinion about a prior iteration of the nondiscrimination Executive Order explained, prohibiting discrimination by federal contractors promotes economy and efficiency in federal contracting by ensuring "the fullest and most effective use of the Nation's manpower resources … by seeking to eliminate discriminatory practices which might tend to deprive the United States of the services of an important segment of the population in the performance of its contracts." Validity of Executive Order Prohibiting Government Contractors from Discriminating in Employment Practices on Grounds of Race, Color, and National Origin, 42 Op. Att'y Gen. 97 (1961), 1961 WL 4913, at *6; *see also Contractors Ass'n of E. Pa. v. Shultz*, 442 F.2d 159, 170 (3d Cir. 1971) ("[I]t is in the interest of the United States in all procurement to see that its suppliers are not over the long run increasing its costs and delaying its programs by excluding from the labor pool available minority workmen.").

44.     The federal government has continued to affirm that position:

a.     The purpose of Executive Order 11,246 is to "promote the goals of economy and efficiency in Government contracting … [by] reduc[ing] the Government's costs and increas[ing] the efficiency of its operations by ensuring that all employees and applicants … are fairly considered and that, in its procurement, the Government has access to, and ultimately benefits from, the best qualified and most efficient employees."

---

[23] *See* Exec. Order No. 11,375, 32 Fed. Reg. 14,303 (Oct. 13, 1967) (amending Executive Order 11,246 to prohibit sex-based discrimination); Exec. Order No. 13,672, 79 Fed. Reg. 42,971 (July 21, 2014) (amending Executive Order 11,246 to prohibit discrimination on the bases of sexual orientation and gender identity).

Discrimination on the Basis of Sex, 81 Fed. Reg. 39,108, 39,109 (June 15, 2016).

b.   "Discrimination is not just wrong[;] it also can keep qualified workers from maximizing their potential to contribute to the strengthening of our economy."[24]

c.   "[E]mployment discrimination on the basis of sexual orientation or gender identity, like employment discrimination on other bases prohibited by EO 11,246, may have economic consequences," including "reduced productivity and lower profits." Implementation of Executive Order 13,673 Prohibiting Discrimination Based on Sexual Orientation and Gender Identity by Contractors and Subcontractors, 79 Fed. Reg. 72,985, 72,987 (Dec. 9, 2014).

d.   "[W]orkplace harassment affects *all* workers, and its true cost includes decreased productivity, increased turnover, and reputational harm. All of this is a drag on performance – and the bottom line."[25]

45.   To effectuate the goal of eliminating employment discrimination, Section 202 of Executive Order 11,246 sets forth a standard Nondiscrimination Provision that must be included in every federal contract. As amended, it now states:

---

[24] White House Fact Sheet, *supra* note 1.

[25] Select Task Force on the Study of Harassment in the Workplace, U.S. Equal Emp't Opportunity Comm'n, *Report of Co-Chairs Chai R. Feldblum & Victoria A. Lipnic* (June 2016), https://www.eeoc.gov/select-task-force-study-harassment-workplace#_Toc453686305; *see also* Sarah Coury, et al., McKinsey & Co., *Women in the Workplace 2020* (Sept. 30, 2020), https://www.mckinsey.com/featured-insights/diversity-and-inclusion/women-in-the-workplace# ("Research shows that company profits and share performance can be close to 50 percent higher when women are well represented at the top.").

> The contractor will not discriminate against any employee, or applicant for
> employment because of race, color, religion, sex, sexual orientation, gender
> identity, or national origin. The contractor will take affirmative action to ensure
> that applicants are employed, and that employees are treated during employment,
> without regard to their race, color, religion, sex, sexual orientation, gender
> identity, or national origin.

Exec. Order No. 11,246 § 202, *as amended by* Exec. Order No. 11,375; Exec. Order 13,672

(hereinafter "Exec. Order 11,246 (as amended)").

46.     The Department of Labor is tasked with implementing Executive Order 11,246.

*Id.* § 201.

## III.    The Religious Exemption.

### A.     The History of the Religious Exemption in Federal Contracting.

47.     In 1978, the Department of Labor issued regulations elaborating on the

requirements and mandates of Executive Order 11,246. *See* Compliance Responsibility for Equal

Employment Opportunity, 43 Fed. Reg. 49,240 (Oct. 20, 1978).

48.     Those regulations created a "religious exemption" for certain religious schools,

modeled on a similar exemption for schools provided for by Congress in Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e-2(e)(2). *See* 43 Fed. Reg. at 49,243.

49.     In 2002, President George W. Bush incorporated the religious exemption into

Executive Order 11,246 and mirrored it on the non-school-specific exemption for religious

employers that had been added to Title VII in 1972, 42 U.S.C. § 2000e-1(a) (the "Title VII

religious exemption"). *See* Exec. Order No. 13,279, 67 Fed. Reg. 77,141 (Dec. 12, 2002). The

exemption provides that:

> Section 202 of this Order shall not apply to a Government contractor or
> subcontractor that is a religious corporation, association, educational institution,
> or society, with respect to the employment of individuals of a particular religion
> to perform work connected with the carrying on by such corporation, association,
> educational institution, or society of its activities. Such contractors and

subcontractors are not exempted or excused from complying with the other requirements contained in this Order.

Exec. Order No. 11,246 (as amended) § 204 (hereinafter the "religious exemption" or the "Section 204 Exemption").

50.    The Department then amended its prior regulation on the religious school exemption and codified in regulation the Section 204 exemption. *See* Affirmative Action and Nondiscrimination Obligations of Government Contractors, Executive Order 11,246, as amended; Exemption for Religious Entities, 68 Fed. Reg. 56,392, 56,393 (Sept. 30, 2003) (amending Department regulations to provide that this provision will now be included in federal contracts subject to Executive Order 11,246).

51.    Both the narrower religious-schools exemption and the Section 204 Exemption were interpreted by the Department to allow federal contractors or subcontractors that were religious schools and organizations to give a preference to coreligionist applicants during the hiring process.

52.    The Department explicitly adopted that interpretation in 2015 with a series of guidance documents ("2015 Guidance") to codify and clarify its longstanding interpretation of the Section 204 Exemption.[26] The Department further noted that it intended to continue aligning

---

[26] OFCCP, *Frequently Asked Questions: EO 13672 Final Rule* (archived July 9, 2015), https://web.archive.org/web/20150709220056/http://www.dol.gov/ofccp/LGBT/LGBT_FAQs.html#Q9 (last visited Jan. 20, 2021); OFCCP, *Sex Discrimination Frequently Asked Questions (FAQs)* (archived Dec. 22, 2016), https://web.archive.org/web/20161222125932/https://www.dol.gov/ofccp/SexDiscrimination/sexdiscrimination_faqs.htm (last visited Jan. 20, 2021); OFCCP, Transcript of EO 13,672 Public Webinar (Mar. 25, 2015), https://www.dol.gov/sites/dolgov/files/ofccp/LGBT/FTS_TranscriptEO13672_PublicWebinar_ES_QA_508c.pdf.

its interpretation of the Section 204 Exemption with the Title VII religious exemption "when

determining which organizations can claim the exemption and how it applies."[27]

53.    The Department noted that the exemption was a limited one, which "permits

religious organizations to prefer to employ only members of a particular religion."[28] It made

clear, however, that the Section 204 Exemption "*does not allow religious organizations to*

*discriminate in employment on the basis of race, color, sex, sexual orientation, gender identity,*

*or national origin*."[29]

54.    In so doing, the 2015 Guidance aligned itself with the weight of authority noting

the contours of the Title VII religious exemption—*i.e.*, that the exemption allows employers to

prefer to hire coreligionists, but that is the extent of the exemption.[30]

55.    The Department further explained that the religious exemption applies "only to

those institutions whose purpose and character are primarily religious" and stated that in

determining whether a contractor qualifies for the exemption, it would "consider all significant

---

[27] OFCCP, *Frequently Asked Questions: EO 13672 Final Rule.*

[28] OFCCP, *Sex Discrimination Frequently Asked Questions.*

[29] OFCCP, *Frequently Asked Questions: EO 13672 Final Rule* (emphasis added).

[30] *See Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 192 (4th Cir. 2011) ("Section 2000e-1(a) does not exempt religious organizations from Title VII's provisions barring discrimination on the basis of race, gender, or national origin."); *Boyd v. Harding Acad. of Memphis, Inc.*, 88 F.3d 410, 413 (6th Cir. 1996) (the exemption does not "exempt religious educational institutions with respect to all discrimination. It merely indicates that such institutions may choose to employ members of their own religion without fear of being charged with religious discrimination."); *EEOC v. Pac. Press Publ'g Ass'n*, 676 F.2d 1272, 1276 (9th Cir. 1982) ("The legislative history of [the religious] exemption shows that although Congress permitted religious organizations to discriminate in favor of members of their faith, religious employers are not immune from liability for discrimination based on race, sex, national origin, or for retaliatory actions against employees who exercise their rights under the statute."); *Herx*, 48 F. Supp. 3d at 1175-76 (same); *Hopkins v. Women's Div., Gen. Bd. Of Global Ministries*, 238 F. Supp. 2d 174, 180 (D.D.C.) (same); *Elbaz v. Congregation Beth Judea, Inc.*, 812 F. Supp. 802, 807 (N.D. Ill. 1992) (same).

religious and secular characteristics of the organization, with each case turning on its own facts."[31] The Department elaborated:

> [a]lthough no one factor is dispositive, significant factors that courts have considered to determine whether an employer is a religious organization … include: whether the contractor is not for profit, whether its day-to-day operations are religious (e.g., are the services the contractor performs, the product it produces, or the educational curriculum it provides directed toward propagation of the religion?); whether the contractor's articles of incorporation or other pertinent documents state a religious purpose; whether it is owned, affiliated with or financially supported by a formally religious entity such as a church or other religious organization; whether a formally religious entity participates in the management …; whether the contractor holds itself out to the public as secular or sectarian; whether the contractor regularly includes prayer or other forms of worship in its activities; whether it includes religious instruction in its curriculum, to the extent it is an educational institution; and whether its membership is made up of coreligionists.[32]

**B.    The Trump Administration's Expansions of the Religious Exemption.**

56.    President Trump and his administration issued a string of executive orders and rules designed to elevate the rights of those entities asserting religious objections from compliance with civil rights protections. *See, e.g.*, Exec. Order No. 13,798, 82 Fed. Reg. 21,675 (May 4, 2017); Exec. Order No. 13,831, 83 Fed. Reg. 20,715 (May 3, 2018).

57.    On August 10, 2018, and in reliance on those executive orders, the Department issued Directive 2018-03 to "supersede" the 2015 Guidance.[33] The Directive also purported to rely on several Supreme Court cases addressing religious objections to complying with laws of general applicability. It further explained that, in enforcing Executive Order 11,246, agency staff "cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious

---

[31] OFCCP, *Frequently Asked Questions: EO 13672 Final Rule*.

[32] *Id.*

[33] OFCCP, Directive (DIR) 2018-03, Executive Order 11246 § 204(c), Religious Exemption, at n.1 (Aug. 10, 2018), https://www.dol.gov/agencies/ofccp/directives/2018-03.

beliefs and practices"[34] and cannot "condition the availability of [opportunities] upon a recipient's willingness to surrender his [or her] religiously impelled status."[35] Moreover, "[a] federal regulation's restriction on the activities of a for-profit closely held corporation must comply with [the Religious Freedom Restoration Act]."[36] And agency staff must permit "faith-based and community organizations, to the fullest opportunity permitted by law, to compete on a level playing field for … [federal] contracts"[37] and "respect the right of 'religious people and institutions … to practice their faith without fear of discrimination or retaliation by the Federal Government.'"[38]

58.    Shortly thereafter, OFCCP issued a notice of proposed rulemaking ("NPRM") to codify those stated principles into regulation. Implementing Legal Requirements Regarding the Equal Opportunity Clause's Religious Exemption, 84 Fed. Reg. 41,677 (Aug. 15, 2019). The public was given thirty days to comment. *Id.*

59.    OFCCP received 109,726 comments on the proposed rule. 85 Fed. Reg. 79,324, 79,324. Plaintiffs each commented on the rule.

60.    On December 9, 2020, OFCCP published a final rule, entitled "Implementing Legal Requirements Regarding the Equal Opportunity Clause's Religious Exemption," *id.* The Department claimed that it was attempting to "clarify[] the religious exemption." *Id.* at 79,330.

---

[34] *Id.* (quoting *Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*, 138 S. Ct. 1719, 1731 (2018)).

[35] *Id.* (quoting *Trinity Lutheran Church of Columbia, Inc. v. Corner*, 137 S. Ct. 2012, 2022 (2017)).

[36] *Id.* (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2775 (2014)).

[37] *Id.* (quoting Exec. Order No. 13,831, 83 Fed. Reg. at 20,715).

[38] *Id.* (quoting Exec. Order No. 13,798, 82 Fed. Reg. at 21,675).

61. In actuality, the Department's final rule vastly expands the religious exemption, far beyond its appropriately cabined parameters, allowing more federal contractors and subcontractors, with more tenuous connections to religion, to avoid their civil rights obligations by citing religion, broadening the definition of "particular religion" to include religious tenets and practices, and expressly allowing for contractors to justify discriminatory employment decisions based on sex, sexual orientation, or gender identity by claiming a religious objection.

### 1. Expanding who can claim the religious exemption.

62. The religious exemption can only be claimed by a "religious corporation, association, educational institution, or society." *See* Exec. Order No. 11,246 (as amended) § 204.

63. In the Religious Exemption Rule, however, the Department imposed a new test for determining whether a contractor could meet that definition.

64. That test departs from the Department's prior test for making such a determination, as had been set forth in the 2015 Guidance, and from well-settled precedents defining a "religious corporation, association, educational institution, or society" in the context of the Title VII religious exemption, *see Spencer v. World Vision, Inc.*, 633 F.3d 723 (9th Cir. 2011) (per curiam).

65. The Department's new test looks to four factors. In evaluating these factors, the Department set a new and highly deferential standard, largely deferring to a contractor's own claims that it is religious (so long as they are "sincere").

66. **First**, although the rule requires that, for a contractor to qualify as a religious organization, it must be "organized for a religious purpose," that purpose does not need to be the contractor's "only purpose." 85 Fed. Reg. at 79,334. And, although the Department requires "documentary evidence of an organization's religious purpose in its foundational documents,"

18

"[n]o one particular document is necessary," and the Department "will not challenge a sincere claim characterizing a document's statements as religious in the contractor's view." *Id.* at 79,334-35

67.      *Second*, the contractor need not be "primarily" engaged in religious activity—*i.e.*, activity that is "consistent with, and in furtherance of, its religious purpose." *Id.* at 79,335-36. Rather, that activity must be only a "substantial" aspect of the contractor's operations. *Id.* at 79,336. Changing its interpretation of the exemption in this way marked a step away, also, from settled interpretations of the Title VII religious exemption, which weigh an organization's engagement in secular activities *against* a finding that the organization is a religious one.[39] The Department further explained that "[w]hether an organization's engagement in activity is consistent with, and in furtherance of, its religious purpose is determined by reference to the organization's own sincere understanding of its religious tenets." *Id.* at 79,335. For example, the Department made clear that it "would not contradict a drug-rehabilitation center's view, found to be sincere, that its work is a religious healing ministry by stating that its work is merely secular healthcare delivery." *Id.* at 79,334.

68.      *Third*, the rule specified that while a contractor must "hold itself out to the public as carrying out a religious purpose," it could "satisfy this requirement in a variety of ways, including by evidence of a religious purpose on its website, publications, advertisements, letterhead, or other public-facing materials, *or by affirming a religious purpose in response to inquiries from a member of the public or a government entity.*" *Id.* at 79,336-37 (emphasis added). The rule also added a wholly new category of evidence that it would now consider in

---

[39] *See, e.g.*, Appellant Br. at 32-33, Docket No. 22, *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560 (6th Cir. 2018) (No. 16-2424).

evaluating whether a contractor is a religious organization—evidence that is easy to manipulate, including "religiously inspired logos, mottos, or the like; and religious art, texts, music, or other displays of religion in the workplace." *Id.* at 79,337.

69.     **Fourth**, the contractor need not be a non-profit to claim the exemption, as it can: "either '(A) operate[] on a not-for-profit basis; or (B) present[] other strong evidence that it possesses a substantial religious purpose.'" *Id.* at 79,339. The Department explained that this new subparagraph (B) "is a helpful contingency for situations where a contractor may not satisfy this prong of the test but in all fairness should be considered a qualifying religious organization." *Id.* By adding subparagraph (B), however, the Department departed from settled interpretations of the Title VII religious exemptions, which require non-profit status.[40]

### 2.     *Expanding the scope of the religious exemption.*

70.     The Department made several additional changes that vastly expand the scope of the religious exemption, including by allowing contractors to make employment decisions based on the private and personal choices of employees and applicants, even if those employment decisions constitute discrimination on the basis of sex, sexual orientation, or gender identity. *Id.* at 79,330-31.

71.     **First**, the Department adopted broad definitions of "religion" and "particular religion" that essentially enable a contractor who qualifies for the exemption to make employment decisions based on the private conduct of its employees and applicants for employment.

---

[40] *See World Vision*, 633 F.3d at 734-35 (O'Scannlain, J., concurring); *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 226 (3d Cir. 2007) (citing *EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 618-19 (9th Cir. 1988)).

a.    The Department defined "religion" to include "all aspects of religious observance and practice, as well as belief." *Id.* at 79,371.[41]

b.    The Department defined "particular religion" to mean "the religion of a particular individual, corporation, association, educational institution, society, school, college, university, or institution of learning, *including acceptance of or adherence to sincere religious tenets as understood by the employer as a condition of employment, whether or not the particular religion of an individual employee or applicant is the same as the particular religion of his or her employer or prospective employer*." *Id.* (emphasis added).

72.    By adopting these definitions, the Department expanded the religious exemption so that it is no longer "restricted to a purely denominational preference," *id.* at 79,344—as had been the settled understanding of the religious exemption under both Executive Order 11,246 and Title VII. Rather, the rule now "allows religious contractors not only to prefer in employment individuals who share their religion," but also "to condition employment on acceptance of or adherence to religious tenets as understood by the employing contractor." *Id.* (allowing religious organizations to employ, or promote, "only persons whose beliefs *and conduct* are consistent with the employer's religious precepts" (emphasis added)).

73.    **Second**, the Department took the extraordinary position that the religious exemption allows a religious organization to make employment decisions that discriminate on the basis of sex, sexual orientation, or gender identity. *Id.* at 79,353-55. In so doing, the

---

[41] It further noted that its definition would exempt certain federal contractors from their "duty to accommodate [an employee's] religious practice." 85 Fed. Reg. at 79,331.

Department determined that it does not have a "compelling interest in enforcing [Executive Order] 11,246 when a religious organization takes employment action solely on the basis of sincerely held religious tenets that also implicate a protected classification, other than race." *Id.* at 79,354.

74.     As a result, "[r]eligious organizations that serve as government contractors [are exempted from the nondiscrimination requirements of Executive Order 11,246] where religious organizations maintain, for instance, sincerely held religious tenets regarding matters such as marriage and intimacy which may implicate certain protected classes." *Id.* at 79,364.

75.     The Department's efforts on this score contradict the Supreme Court's determination that eliminating sex discriminating *is* a compelling interest, *see Bd. of Dirs. of Rotary Int'l*, 481 U.S. at 549; *Roberts*, 468 at 626, and departs from the Department's prior interpretation of the religious exemption, as well as settled precedent under Title VII,[42] that cabined the religious exemption to denominational preference in the context of hiring.

76.     **Third**, the Department departed from its prior position, Title VII, and the text of Executive Order 11,246 in determining that the religious exemption would cover *all* employment decisions and practices, not just hiring, and regardless of whether those decisions and practices were made in furtherance of an employer's religious mission. 85 Fed. Reg. at 79,346-47.

77.     **Fourth**, the Department emphasized that it would take a highly deferential approach when examining a contractor's claim that any allegedly discriminatory conduct was justified under the religious exemption.

_____

[42] *See Kennedy*, 657 F.3d at 192 ("[Title VII's religious exemption] does not exempt religious organizations from Title VII's provisions barring discrimination on the basis of race, gender, or national origin."); *Pac. Press Publ'g Ass'n*, 676 F.2d at 1277; *EEOC v. Fremont Christian Sch.*, 781 F.2d 1362, 1366, 1368 (9th Cir. 1986); *see also Hamilton v. Southland Christian Sch.*, 680 F.3d 1316, 1319-21 (11th Cir. 2012); *Herx*, 48 F. Supp. 3d at 1174-76.

78.     Under the Religious Exemption Rule, once the Department determines that a federal contractor or subcontractor is a "religious organization" under the newly deferential test, it will then "merely ask[] whether a sincerely held religious belief actually motivated the institution's actions." *Id.* at 79,341 (citing *Geary*, 7 F.3d at 330). The Department further stated that the burden on an employer to explain its discriminatory action "is considerably lighter than in a non-religious employer case, since the organization, at most, is called upon to explain the application of its own doctrines." *Id.* at 79,357 (quotations and citation omitted). And it adopted an ambiguous definition of "sincere": meaning "sincere under the law applied by the courts of the United States when ascertaining the sincerity of a party's religious exercise or belief." *Id.* at 79,372. The Department also made clear an allegedly religiously motivated policy—for example, the policy of preferring male candidates for managerial positions—does not need to be applied "uniform[ly]" to be sincere. *Id.* at 79,357.

79.     Yet, in adopting this deferential standard, the Department failed to even mention the potential harms at stake—namely, that the expanded religious exemption would harm particular communities, including women and LGBTQ workers. This standard is also ripe for misuse, which did not seem to concern the Department whatsoever.

80.     Indeed, the Department went so far as to incorporate into regulation the interpretive principle that the religious exemption be "construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the U.S. Constitution and law." *Id.* at 79,372.

### 3.     *The Department's flawed justification for the rule.*

81.     The Department provided two primary justifications for issuing the Religious Exemption Rule—both of which are unreasoned and unsupported by the record.

82.    ***First***, the Department stated that it needed to update its interpretation of the religious exemption based on recent Supreme Court decisions addressing, in other contexts, issues of entities claiming religious objections to complying with laws of general applicability or alleging that they were being discriminated against as religious organizations. *See id.* at 79,324-25 (citing *Masterpiece Cakeshop*, 138 S. Ct. at 1731; *Trinity Lutheran*, 137 S. Ct. at 2022; *Hobby Lobby*, 134 S. Ct. at 2,775; *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 196 (2012)).

83.    However, and as commenters pointed out, these cases arose in different statutory and regulatory contexts and their holdings are limited to those contexts. *See, e.g.*, *Trinity Lutheran*, 137 S. Ct. at 2024 n.3 (limiting the holding to "express discrimination based on religious identity with respect to playground resurfacing"). Moreover, as commenters explained, the Department's reading of those cases is incorrect.

84.    ***Second***, the Department justified the rule based on its assertion that some religious organizations have been "reluctant to participate as federal contractors because of uncertainty regarding the scope of the religious exemption," 85 Fed. Reg. at 79,328, and that "[a] broader view of the religious exemption" would "encourage[] more religious organizations to seek to become federal contractors and subcontractors" and thus "provid[e] for a broader pool of government contractors and subcontractors," *id.* at 79,329, 343.

85.    However, as commenters pointed out and as the Department itself admitted, the Department provided no evidence whatsoever to support its claim that religious organizations have been deterred from participating in federal procurement. *See id.* at 79,329 ("Admittedly, OFCCP cannot perfectly ascertain how many religious organizations are government contractors, or would like to become such, and how those numbers compare to the whole of the contracting

pool."). And it improperly dismissed the numerous examples, provided by commenters, of religious organizations that already hold federal contracts.

86.    The failure to produce evidence in support of these purported justifications also undercuts the Department's bare assertion that the rule will "increase economy and efficiency in government contracting" by expanding the pool of potential federal contractors. *Id.* at 79,343. Not only is that assertion not supported by the record, it also marks an unexplained departure from the Department's prior determination that a more narrowly cabined religious exemption best promoted economy and efficiency in federal contracting.

87.    Moreover, the Department's stated aim to encourage more religious organizations to become federal contractors and subcontractors conflicts with its assertion that the rule will not lead to a significant increase in discriminatory employment practices because "religious organizations do not appear to be a large portion of federal contractors." *Id.* at 79,365.

### 4.    *Impacts of the rule on women and LGBTQ community individuals.*

88.    Putting aside the Department's faulty justifications, what the Religious Exemption Rule does, at bottom, is allow certain contractors to take employment action based on how the contractor believes people should behave, as long as the action is tied, even tenuously, to a cited religious belief, and even though the action would otherwise constitute unlawful discrimination.

89.    Even the Department recognized as much, noting as an example that a federal contractor can now make discriminatory employment decisions relying on "sincerely held religious tenets regarding matters such as marriage and intimacy." *Id.* at 79,364.

90.    That means that many examples of discriminatory employment decisions—like firing a woman for getting pregnant when she is unmarried, refusing to provide health insurance to women because they are not believed to be the heads of household, firing a transgender

worker who is in the process of transitioning, or refusing to hire an applicant because they are married to someone of the same sex—are now sanctioned by the federal government and, because the rule applies specifically to federal contractors, funded by the U.S. taxpayer.

91.    Despite these real harms at stake, the Department refused to consider the potential impacts this rule would have on women and LGBTQ individuals. *See id.* at 79,368 ("[A]ny attempt to project costs to employees would necessarily require OFCCP to speculate that certain workers will face discrimination only once this rule is finalized.").

92.    This refusal is both appalling and legally flawed.

93.    Indeed, the Supreme Court has specifically held that, when requiring accommodation of religious interests, the government "must take adequate account of the burdens" the accommodation places on third parties and ensure it is "measured so that it does not override other significant interests." *Cutter*, 544 U.S. at 720, 722.

94.    Moreover, because the Department previously found that carefully cabining the exemption was necessary to balance the interests at stake and protect workers, including (as relevant here) women and LGBTQ workers, it was thus required to explain why it now finds the opposite: that the potential harms to employees—particularly, women and LGBTQ employees— are insufficient to justify a narrow interpretation of the exemption. *See Fox Television Stations, Inc.*, 556 U.S. at 502, 537 (2009) (in changing position, an agency needs to address "prior factual findings").[43]

---

[43] The Department also wholly ignored an alternative presented by commenters: that the Department should, in accordance with White House guidance, conduct "additional research prior to rulemaking" because "[t]he costs of being wrong may outweigh the benefits of a faster decision." *See* M.V. Lee Badgett, et al., Comment Letter, *supra* note 6, at 15 (citing Off. of Mgmt. & Budget, Exec. Off. of the President, Circular A-4 at 39 (Sept. 17, 2003)).

95.     In sum, the Religious Exemption Rule is inconsistent with, and undercuts the purpose of, Executive Order 11,246—what is, at its heart, a nondiscrimination law, borne of a longstanding policy that organizations receiving taxpayer dollars in the form of federal contracts should not be permitted to discriminate. And it does so without so much as a mention of the harms the rule will cause to communities that the Executive Order was designed to protect. It is thus arbitrary and capricious.

IV.     **The Religious Exemption Impedes Plaintiffs' Missions and Will Cause a Diversion of Resources.**

    A.     **Plaintiffs' Missions Are to Promote Equity and Diversity in the Workplace.**

96.     Plaintiffs Oregon Tradeswomen, Pride at Work, and AFT each have a mission of promoting equity and diversity in the workplace.

97.     Oregon Tradeswomen specifically focuses on increasing the number of women, including women of color and LGBTQ women, who work in the trades (e.g. construction and metal working).

98.     Pride at Work specifically focuses on promoting equality for LGBTQ individuals in workplaces, unions, and the broader community.

99.     AFT works to protect its members—including its women and LGBTQ members—who work in the fields of healthcare, education, and civil service.

    *1.     Oregon Tradeswomen.*

100.     Oregon Tradeswomen's mission is to promote success for women in the trades through education, leadership, and mentorship. It has been in operation since 1989. Annually, Oregon Tradeswomen serves approximately 4,000 women through their various support services discussed below.

101.    Oregon Tradeswomen offers an apprenticeship readiness program called Pathways to Success. This is an eight-week, free-of-charge, women-only program designed to prepare women for a high skill, high wage career in the trades.

102.    Oregon Tradeswomen serves approximately 120 women per year as a part of the Pathways for Success program—many of whom go on to jobs in the construction and metal working industries, including at companies with federal contracts. Approximately 63% of the women who enter Oregon Tradeswomen's Pathways for Success program are in poverty. However, given the average starting wage for trades positions—which, in 2019, equaled $21.87 hourly—women who successfully complete the Pathways for Success program and go on to secure trades positions improve their economic standing significantly.

103.    In addition, Oregon Tradeswomen provides counseling and other supportive services to women in the trades, including: (1) counseling to women who have experienced on-the-job harassment regarding their options for proceeding with discrimination complaints and/or other coping strategies, (2) transportation to and from job sites, (3) referrals to mental health professionals and/or substance abuse services, (4) child care, and (5) housing support.

104.    Oregon Tradeswomen also works to increase retention rates for women in trades positions, as well as to support women's efforts to grow in their careers. To do so, Oregon Tradeswomen provides continuing education programs, hosts monthly networking events, and facilitates a mentorship program. Oregon Tradeswomen also runs the Tradeswomen Leadership Institute—an annual event designed to, among other things, provide continuing education on career advancement for women in the trades.

105.    Oregon Tradeswomen also provides equity and diversity training programs and materials for apprenticeship programs, unions, and industry stakeholders to educate them about

legal nondiscrimination mandates, as well as best practices for promoting equity and inclusion in the workplace.[44] Among these, Oregon Tradeswomen hosts an annual event, called the Diversity Summit, which provides an opportunity to highlight and share best practices to create access, opportunity, and equity in the region's construction industry.

106.    Moreover, and in response to increased incidents of hate crimes on jobsites, Oregon Tradeswomen is involved in a regional campaign called Safe from Hate, which calls on industry stakeholders to advance diversity, equity, and inclusion in the jobsite culture.

107.    Each of these activities and efforts serves Oregon Tradeswomen's mission of increasing the number of women in the trades industries and promoting equitable, diverse, and nondiscriminatory workplace cultures.

108.    This is a vital mission, given that sex discrimination against women and LGBTQ individuals is an all-too-common staple in the trades industry. Oregon Tradeswomen regularly serves women who have experienced discrimination, including harassment and mistreatment tied to gender identity, sexual orientation, reproductive healthcare choices, and pregnancy.

### 2.    Pride at Work.

109.    Pride at Work is an official constituency group of the American Federation of Labor and Congress of Industrial Organizations. The organization represents the interests of LGBTQ union members. Its mission is to seek full equality without restriction or barriers for LGBTQ individuals in workplaces, unions, and communities, creating a labor movement that cherishes diversity, promotes inclusion, encourages openness, and ensures safety and dignity.

---

[44] *See, e.g.*, Oregon Tradeswomen, Inc., et al., *Regional Respectful Workplace Model Review Committee Recommendations: Tools to Address Jobsite Culture in Construction* (Oct. 2020), https://www.worksystems.org/sites/default/files/Respectful%20Workplace%20Review%20Committee%20Recommendations%20Report.pdf.

110.    To achieve its mission, Pride at Work engages in extensive educational and training activities for unions and industry stakeholders by facilitating in-person diversity, equity, and inclusion trainings and workshops at unions and labor-management conferences and provides unions with best-practice materials to ensure they are meeting the needs of their LGBTQ members.

111.    For example, Pride at Work held numerous trainings to inform unions about the 2014 amendment to Executive Order 11,246, which expanded the nondiscrimination prohibition to cover discrimination on the basis of gender identity and sexual orientation.

112.    Pride at Work also includes information about various state and federal "religious exemptions," including the religious exemption at issue here, as a standard part of its training packages.

113.    Additionally, Pride at Work counsels and advises unions about issues related to collective bargaining agreements—in particular, by educating unions about the importance of enshrining protections for LGBTQ members in contracts, and by providing unions with model contract language.

114.    Pride at Work also advises and supports union affinity groups and helps unions to develop internal LGBTQ programming and trainings.

115.    Finally, Pride at Work counsels individual LGBTQ union members by providing "know your rights" trainings and materials, and by advising LGBTQ individuals on a variety of workplace issues. For example, Pride at Work may advise an LGTBTQ individual who has experienced harassment in the workplace on how to navigate union complaint processes. Or Pride at Work may advise an LGBTQ individual on how to be more open about their sexual orientation or gender identity in the workplace.

### 3.    AFT.

116.    AFT represents at least 350 members who work at federal contractors, including many women and LGBTQ members.

117.    AFT believes strongly in promoting a diverse workforce and in eliminating all forms of employment discrimination, including discrimination on the basis of sex, sexual orientation, or gender identity.

118.    AFT's women and LGBTQ members have been subjected to employment discrimination based on their sex, sexual orientation, or gender identity.

119.    Accordingly, AFT invests significant resources at the national and local levels to ensure that employers are deterred from engaging in discriminatory behavior and that AFT's women and LGBTQ members have access to recourse when subject to discriminatory behavior.

120.    For example, AFT provides financial support and advice to local affiliates on how to best represent members who have been subjected to employment discrimination through the grievance and arbitration processes.

121.    AFT also educates its local affiliates on changes in the law and best practices for guarding against employment discrimination.[45]

122.    In addition, AFT supports its local affiliates' collective bargaining efforts to include in collective bargaining agreements antidiscrimination provisions that protect women and LGBTQ members.

123.    AFT also works to educate union leaders and members about employment discrimination and tools to fight it. For example, in 2019, AFT hosted a conference entitled

---

[45] *See, e.g.*, AFT Higher Education, *Creating a Positive Work Environment for LGBT Faculty: What Higher Education Unions Can Do* (2013), https://www.aft.org/sites/default/files/wysiwyg/genderdiversity_lgbt0413.pdf.

"AFT Civil, Human and Women's Rights Conference," with workshops related to fighting discrimination, including employment discrimination on the basis of sex, sexual orientation, or gender identity, among others.[46]

### B.    The Religious Exemption Rule Injures Plaintiffs.

124.    Oregon Tradeswomen, Pride at Work, and AFT have as their core missions the promotion of equity and inclusion in employment.

125.    The Religious Exemption Rule directly conflicts with those missions. By allowing a broader set of federal contractors to make discriminatory employment decisions based on a tenuous connection to religious belief, the rule makes it more likely that these vulnerable communities will experience discrimination and harassment at increasing rates. Moreover, it is sowing confusion and fear, as women and LGBTQ individuals struggle to understand whether and how their employers, or prospective employers, might cite to the religious exemption as a means to try to justify harassment and discrimination.

126.    As a result, Oregon Tradeswomen anticipates spending significant resources to counteract the rule's impact, including by: (1) adding staff capacity to handle an anticipated increase in the volume of calls from women seeking counseling and other support services, (2) updating training materials and best-practices materials to account for the change in legal landscape, (3) monitoring what employers in the area indicate their intention to claim the religious exemption and/or alter their practices in light of this rule, (4) provide additional staff training on the substance of the rule and how it will affect the organization's work, and (5) develop additional technical assistance for employers.

---

[46] AFT, *2019 AFT Civil, Human and Women's Rights Conference*, https://www.aft.org/chwr2019 (last visited Jan. 20, 2021).

127.    Pride at Work also anticipates spending resources by: (1) updating its training, best-practices, and "know your rights" materials, (2) increasing its efforts to convince unions that nondiscrimination and diversity principles should be a central part of a union's collective bargaining strategy, (3) providing unions with updated and revised draft contract language, (4) counseling unions on whether/how to address the religious exemption issue specifically in the collective bargaining process, (5) developing and communicating strategies for defending against an employer's assertion of the religious exemption as grounds to justify discriminatory action, and (6) increasing its staff resources to field an anticipated uptick in calls from unions and union members with questions about how the religious exemption affects the rights of LGBTQ workers.

128.    AFT, too, will have to spend resources, including by: (1) providing updated educational materials and guidance to local affiliates about the effect of the rule, (2) advising local affiliates on how to defend against an employer's invocation of the broadened religious exemption, (3) providing additional support to local affiliates in the collective bargaining processes to ensure that strong nondiscrimination provisions are added to, or remain in, contracts, and (4) providing additional resources to support an anticipated increase in the number of discriminatory complaints raised by AFT's women and LGBTQ members. In addition, AFT's local affiliates will have to expend resources for similar reasons to: (1) learn about the Religious Exemption Rule, (2) strategize about how to defend against an employer's assertion of the rule as a reason to justify its discriminatory employment actions, (3) adjust collective bargaining strategies to ensure that nondiscrimination protections are included in contracts, and (4) prepare and expend the resources that will be necessary to field additional complaints of discrimination

by women and LGBTQ members. AFT's women and LGBTQ members will also be harmed by the increased risk that they will experience discrimination.

## CLAIMS FOR RELIEF

### Count One
### (Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C))

129.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations.

130.    The Administrative Procedure Act requires this Court to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or that is "in excess of [an agency's] statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C).

131.    The Religious Exemption Rule is final agency action.

132.    The Religious Exemption Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and in excess of the Department's statutory authority because, among other things, the Department

    a.    acted outside its delegated authority under Executive Order 11,246;

    b.    failed to provide a reasoned explanation for a significant change in its interpretation of the religious exemption in Executive Order 11,246;

    c.    promulgated a rule that is inconsistent with Title VII, 42 U.S.C. § 2000e-1(a);

    d.    failed to adequately explain how the rule promotes economy and efficiency in federal contracting;

    e.    failed to respond adequately to comments and improperly limited the comments considered;

      f.      failed to consider important aspects of the problem before it and relied on

factors other than those Congress directed it to consider;

      g.      failed to address plausible alternatives; and

      h.      made findings and conclusions that are unsupported by the record.

**REQUEST FOR RELIEF**

Plaintiffs respectfully request this Court grant the following relief:

      1.      declare the Final Rule contrary to law, arbitrary and capricious, and procedurally

infirm;

      2.      vacate the Final Rule;

      3.      award Plaintiffs its costs, attorneys' fees, and other disbursements for this action;

and

      4.      grant any other relief this Court deems appropriate.

Dated: January 21, 2021                Respectfully submitted,

                                    */s/ Whitney Stark*

<table>
<tr>
<td>

Karianne M. Jones (*pro hac vice forthcoming*)
Robin F. Thurston (*pro hac vice forthcoming*)
Sean Lev (*pro hac vice forthcoming*)
DEMOCRACY FORWARD FOUNDATION
1440 G St., NW #8126
Washington, D.C. 20005
(202) 448-9090
kjones@democracyforward.org
rthurston@democracyforward.org
slev@democracyforward.org

Sunu Chandy (*pro hac vice forthcoming*)
Emily Martin (*pro hac vice forthcoming*)
Maya Raghu (*pro hac vice forthcoming*)
NATIONAL WOMEN'S LAW CENTER
11 Dupont Circle NW

</td>
<td>

Whitney Stark (D. Oregon Bar No. 090350)
ALBIES & STARK LLC
1 SW Columbia St., Suite 1850
Portland, OR 97204
(503) 308-4773
whitney@albiesstark.com

</td>
</tr>
</table>

35

Washington, D.C. 20036
(202) 588-5180
schandy@nwlc.org
emartin@nwlc.org
mraghu@nwlc.org